STEIGER, Respondent, vs. PHIPPS and another, Appellants.
NILSSEN, Respondent, vs. SAME, Appellants.

*February 16—May 17, 1938.*

For the appellants there were briefs by *Hale & Skemp* of La Crosse and *Regan & McCue* of Milwaukee, and oral argument by *Quincy H. Hale.*

For the respondents there were briefs by *Grady, Farnsworth & Walker* of Portage, and oral argument by *Dorothy Walker* and *Daniel H. Grady.*

The following opinion was filed March 15, 1938:

ROSENBERRY, C. J.   Upon the trial the jury found that the defendant Phipps was not negligent in the operation of his automobile with respect to speed, lookout, management, or control, and that the defendant Phipps was not negligent in the management and control of his automobile so as to increase the danger or add to the risk which the guests assumed when they entered the defendant's automobile.

Upon motions after verdict, the trial court held that a jury question was presented, and that the answers returned by the jury were supported by the evidence, and denied the plaintiffs' motions to change the answers to these questions.

If no other question were involved in the cases we should be obliged to affirm the trial court's determination on this branch of the case. No useful purpose would be served by setting out all of the evidence.

The defendants contend that the order of the trial court setting aside the verdict and granting a new trial in the interest of justice is based upon a mistake of law, and for that reason the rule which makes the granting of such orders a matter of discretion with the trial court does not apply. *State ex rel. Mahnke v. Kablitz* (1935), 217 Wis. 231, 258 N. W. 840. The contention made by counsel for defendants requires us to state the facts relevant upon that contention in some detail.

The plaintiff Nilssen was divorced from her husband some years ago in the county of Douglas. Thereafter, she removed with her daughter, at the time of the trial aged seventeen, and her son, aged ten, to the city of La Crosse. There she became acquainted with the defendant Phipps. He came to board and room at her house, and thereafter they embarked upon the building of houses for sale. They had erected two or three houses prior to the time of the accident in question. In August, 1936, the plaintiff Nilssen's divorced husband brought on for hearing at Superior a motion to change the custody of a child from the plaintiff Nilssen to himself. Mrs. Nilssen had no car; the defendant Phipps had a comparatively new Dodge car, and also had business reasons for going to Superior, and offered to drive the plaintiff Nilssen to Superior. The hearing in the divorce matter was to come on on Thursday, August 27, 1936, at 10 o'clock. Mr. and Mrs. Steiger were friends of the plaintiff Nilssen and of the defendant Phipps, and they

4

were invited to go along as guests. The party left La Crosse in the evening of August 26th, arriving at Superior about 3 o'clock in the morning of August 27th. After the court hearing, the party left for La Crosse between 3:30 and 4 o'clock in the afternoon. Defendant Phipps was in the front seat driving; Mr. Steiger was in the right front seat with his eight-year-old son, Dale, sitting on his lap. The plaintiff Nilssen sat on the rear seat back of the driver, Mrs. Steiger on the right-hand side in the rear seat, and Mrs. Nilssen's daughter, Vale, sat between them. The accident happened about 6 o'clock in the evening, ten miles north of Spooner and sixty-five miles south of Superior. As the party left Superior the road was dry. The weather was threatening when they left, and after they had proceeded five or ten miles out of the city it commenced to sprinkle. The rain increased in intensity and during the last few miles it was raining quite hard. The road was a state trunk highway in excellent condition, with black top most of the way, and slippery in the rain. After the party left Superior, and it had begun to rain, the plaintiff Nilssen testified that she cautioned the defendant Phipps to drive slower. He did so for a short distance, and then increased his speed; after six to ten miles she again cautioned him, and he again slowed down, but gradually increased his speed so that at the end of another ten miles he again increased his speed. At a point about ten miles north of the accident, after being cautioned by Mrs. Nilssen again, Phipps became angry, pulled the car to the side of the road, stepped out, and said if there was anyone who could drive better they should drive. There was some argument, but finally Phipps got back into the car and continued to drive. The plaintiff Nilssen, relying upon his promise to drive carefully, went to sleep, as did her daughter. Mrs. Steiger testified that Phipps drove carefully and prudently prior to the accident. The testimony of Mr. Steiger was that in his opinion the defendant drove too

fast. He further testified that everything was going all right until Phipps attempted to reduce the speed by putting on the brakes. He said:

"At first he just put his brake on a little, just to slow it up which made a little swerve of the front wheels and as soon as it started to swerve he jammed on the brakes and then the car really started to skid and the accident resulted."

Mrs. Nilssen sustained a broken wrist; Mrs. Steiger a cut on the head and other injuries. The injured persons were given first aid, and the parties returned to La Crosse; the men driving the car which proceeded under its own power after the accident; the women returning by train.

Messrs. Hale and Burke were attorneys for the insurance carrier, and were directed to procure statements from those who witnessed the accident. Mr. Burke procured a statement from Phipps, after which he went to the home of the plaintiff Nilssen to take her statement. She was not at home when he arrived, but Phipps was there and told him that Mrs. Nilssen would be home shortly. When she came her statement was apparently taken in the presence of Phipps. Mr. Burke had with him the statement made by Phipps, and apparently some reference was made to the statement made by him in taking Mrs. Nilssen's statement. After the statement was signed by Mrs. Nilssen, her daughter, who was engaged in domestic duties about the house, was called in and also signed the statement; it appearing over her signature that she had read the statement. Upon the trial Mrs. Nilssen was sworn and examined on behalf of the plaintiffs. It should be said that before the trial Mr. Burke had died and the trial was conducted by Mr. Hale. He cross-examined her with respect to the statement she had made to Mr. Burke. She testified:

"I don't remember of telling Mr. Burke 'I was riding with Mr. Phipps at the time of the accident sitting on the left-hand side of the rear seat.' I did tell him, 'The car is

owned by Mr. Phipps.' I didn't tell Mr. Burke 'Mr. Phipps, Mr. and Mrs. Steiger, Vale and I had been subpœnaed to appear in the circuit court at Superior.' I did tell him 'Mr. Nilssen was trying to have his alimony reduced.' I didn't tell him 'I was to pay Mr. Phipps for the gas used and to pay the expenses of the trip,' "—

and many other statements of like character which tend to impeach the correctness of the statement made by her to Mr. Burke as taken down by him.

At the close of Mrs. Nilssen's testimony, a question was raised as to the propriety of Mr. Hale appearing for both the defendant Phipps and his insurance carrier. It appears without dispute that Mr. Hale was retained by the insurance company to defend Mr. Phipps and was being paid by the insurance company. It also appears that there was no conflict of interest as between the insured and the insurer, except that a claim had been made that Phipps and Mrs. Nilssen were sharing the expense of the trip, and for that reason the insurance carrier was not liable because the car was being used for hire. During the conference the contention that the car was being used for hire at the time of the accident was withdrawn, and was not further adverted to during the trial, and no question respecting it was submitted to the jury.

After the examination of Mrs. Nilssen was closed, Mrs. Steiger and the daughter, Vale Nilssen, were called, and considerable medical testimony was introduced. Phipps was called as a witness by the plaintiffs for cross-examination under the statute. Upon his cross-examination he testified quite fully in regard to the statement made by Mrs. Nilssen to Mr. Burke. At that time he was asked only one question by Mr. Hale, and that was whether or not he and Mrs. Nilssen were still on friendly terms. At the close of the plaintiffs' case, the defendants called Mrs. Steiger and Mrs. Nilssen for cross-examination under the statute. There was

also medical testimony in rebuttal. During the argument of the case to the jury the incident occurred which was the basis of the court's order granting a new trial. With respect to that the record discloses the following:

"Mr. Hale argued to the jury in behalf of the defendant. During his argument:

"Miss Walker: If the court please, we would like to have the record show that counsel has just stated that Mr. Phipps was Mrs. Nilssen's star boarder and roomer for two years and has been since the time of the accident, that only one other time in seventeen years counsel has not put his client on the stand, but that if he did put any witness on the stand, he feels that he is vouching for that witness and for that reason he did not swear Mr. Phipps.

"We also ask that the reporter be directed to take down the argument of counsel in so far as it affects any relationship between counsel and Mr. Phipps, or between Mr. Phipps and Mrs. Nilssen. We would also like the record to show that Mr. Hale has now stated to the jury that he is counsel for the insurance company and for Mr. Phipps and that up until this time the records in this proceeding showed that counsel has appeared solely for Mr. Phipps and J. H. Regan of Milwaukee is the attorney for the insurance company and has been present throughout the trial.

"Court: There is no necessity for the ruling of the court. The reporter will take such portion of the argument.

"Mr. Hale: Coming back to my previous argument, I stated that when a lawyer puts a witness on the witness stand, he impliedly vouches for his veracity and his honesty and I didn't believe and I don't believe that Mr. Phipps was telling the truth when he stated in substance here and bore out the statements that Mrs. Nilssen made, that Mr. Burke had either intentionally or unintentionally deceived her as to what was in this statement, and deceived the daughter and tricked the daughter into signing a statement which she hadn't read and which wasn't the truth. In other words, I don't believe Mr. Burke did that or that he would do it either intentionally or unintentionally, and I believe that when Mr. Phipps made that statement, he deliberately falsi-

fied and I wouldn't put him on the stand and vouch for his testimony in any one detail of his testimony.

"I think you remember that Mrs. Nilssen stated—that Mr. Phipps stated that when Mr. Burke came out there, he was working outside and Mrs. Nilssen was away from home and he told Mr. Burke to go in the house and sit down until she came back. Of course, that has significance because the statement is taken August 31st and at least Mrs. Nilssen was up and around at that time. Eventually she came back, Mr. Phipps said, and they went in the house and the three of them sat down in a room or Phipps in an adjacent room, and Mr. Burke started asking the question, and then Mrs. Nilssen—And ladies and gentlemen of the jury, it is your privilege to take any of these exhibits in the juryroom. I hope when you do retire to the juryroom, you will take this with you. Mr. Phipps stated that after he had jotted it down, and this is Mrs. Nilssen's story also, that he read it to them, but that he left out many, many statements that had a very vital bearing on how this accident happened.

"I submit, members of the jury, that anyone reading that statement as it is written, even though he was the most dishonest person in the world and a most careful liar, would read this statement and think: 'I can't read that,' and jump down the next one and finally after reading that, he would ask for their signature. He wouldn't know but what they would ask to read the statement or that the daughter would ask to read it. He would certainly have been in a jack pot then, wouldn't he?

"Well then this statement, 'I have read the above and the same is true as near as I can tell and the accident happened in this manner,' signed by Vale Nilssen, then sixteen years old, a junior in high school. Wouldn't it have been utterly ridiculous for him to have written a statement like that, then hand this statement over to this sixteen-year-old, educated young lady, and trust to luck she wouldn't read the statement and wouldn't read what he had written above. She took the stand. She said she didn't read any part of the statement and didn't read that statement above her signature and simply signed when Mr. Burke passed the paper over to her. I think that is just as impossible as Mrs. Nilssen's

story. I don't believe it is true. I wouldn't put Mr. Phipps on the stand and vouch for his veracity in that detail or any other detail.

"I had almost expected when opposing counsel called Mr. Phipps, that he would prove to be absolutely their best witness, and I am almost surprised that instead of saying he went 55 to 60 miles an hour, he didn't have it up to 80. I think this star boarder is interested in giving these plaintiffs just as much as you possibly can, as the plaintiffs are themselves, and so I say I didn't put him on the witness stand and it is my second time in sixteen or seventeen years of practice here that I haven't put my witness on the stand in a lawsuit, in other words, if I didn't think they were telling the truth, I wouldn't get into court with the case.

"Mr. Hale continued his argument (not taken down)."

At the close of the arguments of counsel the court instructed the jury. He gave no instructions to the jury respecting the conduct of Mr. Hale upon the trial, and no instructions respecting that matter were requested by either party. Upon the hearing of motions after verdict the record discloses the following:

"Mr. Hale and Mr. Regan for defendants.

"Argument by Miss Walker.

"Court: Had you given any thought to the question of whether or not—as to the question of uniformity of interests? There was a divergent interest as to the insurance company and the insured. There was a difference in their interests in this lawsuit. For instance, suppose he only had—I don't know what the insurance carriage is in this case—suppose it is only $5,000. Suppose a judgment of $10,000 was procured against the insured. There is a divergency of interest there that makes it impossible, doesn't it, for an attorney to represent both?

"Miss Walker: I think that is true.

"Court: I didn't know if you had given any thought to that.

"Miss Walker: No, I am frank to say we had approached that on a different angle.

"Argument by Miss Walker and Mr. Hale.

"Miss Walker: In connection with our motion for a new trial, we desire to offer the entire adverse examination of Charles Phipps in this case for the purpose of showing that several weeks before trial he gave the same testimony in respect to negligence that he did upon the trial.

"Mr. Grady: May that be received, your honor?

"Court: Yes, that will be received.

"Argument by Mr. Grady and Mr. Hale.

"Court: The point that is intriguing the court is not the question of changing those answers to the questions in the special verdict. I am not going to give much thought to that, but what I am interested in is whether those answers to the special verdict were influenced or brought about by any improper conduct of the attorney for the defendant Phipps. I am not going to change the answers, because I believed at the time I submitted it to the jury that it was a jury question, but I am in considerable doubt as to whether or not the fact that this man Phipps, the main defendant, came in here—he could have done just as well without an attorney, he could have come in here and confessed judgment and he would have been no worse off than he is now. He comes in here with an attorney and at the crucial moment in the trial of the case, the attorney tells the jury his client is a conspirator, liar, don't want to believe him at all, and also makes these statements with respect to being a star boarder and a star roomer. I have very serious doubts as to the propriety of that kind of an appearance. If I make up my mind, after reading these briefs, that the remarks of counsel were improper, they certainly were prejudicial and under that state of facts, if I make up my mind to that, I am going to grant a new trial in this case in the interests of justice, but I am going to examine your briefs very carefully and write a memorandum decision.

"Mr. Hale: May I have an opportunity to file an additional brief? I didn't cover that point in it.

"Court: Yes, I will give you plenty of time. If the remarks of counsel were prejudicial and improper, it not only affected the answers to those questions, but it might have affected the answers as to the damages and every other fea-

ture of the case. If you want to file a reply brief, Mr. Hale, serve it on them and produce it to me inside of thirty days."

After briefs had been submitted the trial court filed a memorandum decision. In commenting upon the conduct of Mr. Hale, the court called attention to the fact that Phipps was examined adversely on March 11, 1936, some six weeks before the trial; that from that adverse examination Mr. Hale was advised of the position Mr. Phipps would take at the trial, and therefore

"had knowledge long before the trial began that in some material respects his client was repudiating that statement under oath."

The court then stated that the real question was as to what extent the dual position of Mr. Hale upon the trial and his remarks to the jury had prejudiced the rights of the two plaintiffs to a fair and impartial trial. The court was further of the view that although the question of coverage was withdrawn upon the trial there was still a conflict of interest between the insurer and insured, in this, that if the jury should assess damages beyond the coverage, Phipps would be personally liable. The court then continued:

"In the instant case, defendant Phipps' counsel, selected by the insurance company and paid by it, literally tells the jury that he is ashamed to put him on the stand or to vouch for his testimony because he believes him to be a perjurer and a man who has colored his testimony because of close, personal relationship with the plaintiff Nilssen. The words 'star boarder' and 'star roomer' can be interpreted in no other way than that of sex relationship. It was so interpreted by the court and I have no reason to believe it was otherwise construed by the jury.

"Now the vice of the whole situation, as far as being prejudicial to the rights of the plaintiffs, consists in this: Counsel could not divulge the actual conversations or transactions with his own client, for those are protected by the

plain language of the statutes, section 325.22. This provision would, of course, be a nullity if counsel were permitted to divulge before a jury, his conclusions arising from such relationship; to the detriment of his client's interests. The conclusions of his counsel may often be more harmful than a direct recital of conversations and transactions.

"'That solemn statements of fact, not by way of argument and deduction from the evidence, but as of the counsel's own knowledge, are likely to have weight with juries, cannot be doubted. The respectability and standing of counsel only serves to enhance the peril.' *Gutzman v. Clancy,* 114 Wis. 589.

"Counsel for Phipps, under pay of the insurance company, among many other derogatory statements respecting his own client, said, 'I didn't believe and I don't believe that Mr. Phipps was telling the truth.' 'I believe that when Mr. Phipps made that statement, he deliberately falsified.' In other words, counsel of high standing at the bar, accuses his own client of conspiring with the plaintiffs to defraud the insurance company. Nothing could be more prejudicial to the rights, not only of his own client, but to the rights of the two plaintiffs. The insurance company was obliged, under its policy, to pay the costs of defending the action, including attorneys' fees, but if those terms of the policy are to be construed so as to permit the insurer to collude with the defendant to the extent that this kind of procedure would allow, then the way is always open to defeat the ends of justice.

"The testimony of the defendant Phipps was practically in accord with the testimony of every other occupant of the automobile, including the two plaintiffs in these cases. The charge of counsel that this client was a liar and perjurer and had colluded with the plaintiffs, went to the very foundation of plaintiffs' case. It not merely prejudiced the testimony of Phipps, but it implicated and clearly prejudiced plaintiffs' case. Among the pertinent statements made by counsel for the defendant Phipps, I quote, by Mr. Hale during his argument to the jury: (Set out *supra.*)

"Now the latter part of this statement, to wit: 'If I didn't think they were telling the truth, I wouldn't get into court

with the case,' is a correct statement of what the court believes was counsel's duty. Many months before this case was tried, the defendant Phipps was examined adversely before a court commissioner and as said before in this opinion, testified substantially to what he testified upon the witness stand, so counsel had ample opportunity to retire from the case if he so elected.

"Much has been said by counsel for the defendant with respect to the accuracy of the written statements purported to have been made by his own client and by Mrs. Nilssen and her daughter Vale, and a great deal of stress has been placed upon the fact that Mr. Burke, who took the statements, is deceased and couldn't testify as to the accuracy of these written statements. I have examined Mrs. Nilssen's statement and listened to the testimony of the three persons who are supposed to have been present when she and her daughter signed it, and I am unable to find anything in either the statement or in the testimony that directly reflects upon the integrity and honesty of Mr. Burke. All of the discrepancies between the statement and the testimony of these witnesses can be easily explained on the theory of honest misunderstanding and none of the statements contained in this purported written statement conflict with the testimony given at the trial, except in respect to certain conclusions of the signers as to whether or not Mr. Phipps could have avoided the accident or not. Such testimony, offered in court, would certainly have been rejected on the ground that it called for a conclusion of the witness, and it has no more effect in the written statement than it would have had if offered in open court. In other words, there is nothing in this case that reflects in the slightest degree upon the honesty and integrity of Mr. Burke, and this memorandum decision is not offered as any reflection upon counsel for the defendant Phipps, other than to point out a divergence in the opinion of the court and of counsel as to what the duty of lawyers in a situation of this kind consists of. As said in the beginning of this opinion, I am interested in that feature of the case only in so far as it may prejudice the rights of the plaintiffs to a fair and impartial trial. I am clearly of the opinion that the remarks of counsel and the conduct of

the case in general was not proper and was highly prejudicial to the rights of the plaintiff and that a new trial must necessarily follow in the interests of justice."

If the verdict had been adverse to the defendant Phipps and he were here complaining that he had been prejudiced by conduct of his counsel upon the trial, we should have to consider an entirely different question. We are not called upon in this case to deal with the relation of attorney and client. The jury found in favor of the defendant Phipps, and in that respect the trial court approved the verdict. The real controversy in this case arises out of the fact that in this case, as in many host-guest cases, the defendant host sympathizes, to use no stronger term, with the effort of his injured guests to recover from his insurance carrier the damages sustained by them. While upon the record in this case at the time it was submitted to the jury the legal interests of the insured and the insurer were identical, in that a verdict finding no liability would benefit both, their social interests were divergent, in that the insurance company wished to conserve its funds and the insured was at least willing that his guests should recover from it.

The situation in which Mr. Hale found himself was this : Hale and Burke were attorneys for the insurance carrier. Shortly after the accident Burke had taken a statement from Phipps which appears to have been favorable to a successful defense. The statement is not made a part of the record. Inferences must be drawn from so much of it as appears from the cross-examination. On March 11, 1937, Phipps was adversely examined in preparation for trial. March 19th, Phipps verified an answer in which he denied that he was negligent as to speed, lookout, position on the highway, by suddenly applying the brakes of his automobile, handling or operation of the car he was driving. Phipps reported the accident to the insurance carrier, and under the policy it was

then its duty to defend the action when it was brought. The trial was begun on May 5, 1937.

Upon the merits of the case the insurance company could not interpose a successful defense as to it unless it was also successful as to Phipps. Upon the merits their legal interests were identical. Upon the trial the claim that the automobile was used for hire was withdrawn. The trial court pointed out that there was a conflict of interest because of the limited coverage under the policy. However, any defense which would protect Phipps as against lack of coverage would tend to defeat the liability of the insurance company. The burden which Phipps carried was not less than that of the insurance company, but greater. By the terms of his policy he was bound to aid in the defense of the action for the benefit of the insurance company. His own interest required him to protect himself against possibility of additional liability. The injuries sustained by the plaintiffs in these cases were of such a nature that there was little if any likelihood that the recovery would exceed the coverage of the policy. This would no doubt relieve Mr. Phipps of any anxiety on his own account, and lead to his pursuing a course which tended to aid the plaintiffs rather than the insurance company. If the jury had returned a verdict in excess of the coverage of the insurance policy in spite of the defense that was interposed, the question of Mr. Hale's conduct in respect to the interests and rights of his client would be in question. Mr. Hale's duty in this action was not to assist the plaintiffs in recovering, but to prevent a verdict which would fasten liability upon either Phipps or the insurance carrier. The testimony given upon the trial being at variance with the statement originally made by Phipps to Mr. Burke, and in accordance with the claims of Mrs. Nilssen upon the trial, manifestly there would be a recovery if that testimony was believed by the jury. Confusion in this

case arises from the fact that the defendant Phipps who had contracted and agreed to assist in the defense of the action went to the aid of the plaintiffs by making himself a witness in their behalf, thus making it necessary for the attorneys who represented him and the insurance company to attack the weight to be attached to his testimony. The circumstance that caused the trouble in this case was the changed attitude of Mr. Phipps. Mr. Phipps' testimony with respect to the events immediately preceding and at the time of the accident favors the plaintiffs more strongly than that of Mrs. Steiger and equally as much as that of Mr. Steiger. It being the duty of Mr. Hale under his retainer to defend the action, is he guilty of prejudicial conduct so far as the plaintiffs are concerned because he successfully attacked the credibility of Phipps, who was in fact a witness for the plaintiffs? Having been called adversely by the plaintiffs, the plaintiffs were not bound by any statement which he might make. If his credibility was to be successfully attacked, it was necessary for the defendants to account for their failure to call him. No attack could be made upon the witnesses called on behalf of the plaintiff as to the negligence of the defendant Phipps that was not at the same time and to the same extent an attack upon the testimony of Phipps. Mr. Hale did exactly what any attorney representing the insurance carrier would have done.

Mrs. Nilssen was asleep and knew nothing about the events immediately preceding the accident. Mrs. Steiger testified:

"Upon until a minute or two before the accident happened he [Phipps] had been going 40 or 45 miles per hour. When he jammed on the brakes it went around and hit the bank."

Mr. Steiger testified:

"I would say that he increased his speed from about 40 to 55 miles per hour. . . . I noticed that he just applied his

brakes a little and the car wavered a little and I felt it more and he applied them suddenly."

Mr. Phipps testified:

"After the car started going down the grade the car increased its speed so that it might have picked up ten miles so that I would judge that when I applied my brakes I was going 50 miles an hour. We had gained this speed from 40 to 50 miles an hour in going that one block down grade. In going 40 miles an hour I hadn't noticed any difficulty at all in handling the car but when the speed increased to 50 miles an hour I realized that I should slow down the speed and that was the intention of applying the brakes."

Phipps had told Burke, according to his own testimony, that he was going forty to forty-five miles an hour at the time of the accident. With respect to the application of the brakes, Phipps testified:

"I applied the brakes just to check the car and immediately there was a decided skidding. . . . In attempting to stop the first skid I put the brakes on good and pushed them all the way down so that the skidding after the second application was worse than after the first. . . . I knew that the sudden application of my brakes would cause the car to skid. . . . Within a couple of minutes after the accident someone in the car asked me how it happened and I said I put on the brakes and the car skidded."

With respect to the brakes Mr. Steiger testified:

"I noticed that he just applied his brakes a little and the car wavered a little and I felt it more and he applied them suddenly. The time that elapsed between the partial application of the brakes and when he put them on full force was like the snap of a finger."

This is the gist but not all of the evidence relating to the manner in which the accident happened. The jury apparently believed that in going down hill Phipps did not increase his speed from forty or forty-five miles per hour to fifty-five or sixty miles per hour, but that the accident was due to the manner in which the brakes were applied, or that

it was an inevitable accident. If the jury believed Phipps' evidence as given upon the trial, it would have required them to find Phipps negligent. There is no obligation of course upon a defendant to testify to anything but the truth, even though the truth may be adverse to his interest, but the statements made by Phipps to Burke and those made upon the trial were materially different. The statements made to Burke were brought out upon the trial by cross-examination on behalf of the plaintiff. While the statement made by Phipps to Burke was not offered in evidence by the plaintiffs, a considerable part of its contents was testified to by Phipps upon cross-examination.

Phipps having allied himself with the plaintiffs upon the trial, can it be said that Mr. Hale was guilty of misconduct in arguing the credibility of Phipps' testimony to the jury? We think not. The verdict could not be set aside on the ground of misconduct as between Hale and his client for the very clear reason that Phipps was not prejudiced thereby. The verdict was in his favor. The trial court correctly held that the prejudice which warranted it in setting aside the verdict was prejudicial to the interest of the plaintiffs. The only prejudice in that respect was the breaking down of the evidence which tended to support the plaintiffs' case. It was the duty of the defendants' attorney to point out any weakness in the case that existed, and he cannot be held to be guilty of misconduct in so doing. What the trial court did in this case was to impute such misconduct as might exist as between Hale and Phipps, his client, to Hale as attorney opposing the plaintiffs. They are two quite different things. While Mr. Hale may have been more vehement and made some statements more extravagant than was necessary or even proper, they can hardly be held to be prejudicial. It is to be noted in this connection that counsel for plaintiffs objected to Mr. Hale's appearance for both defendants, but not to the attack made upon the credibility of Phipps. It must

be remembered that this case was tried by able and resourceful counsel upon both sides. Plaintiffs' counsel may very well have considered that Mr. Hale's attack upon the credibility of his client would work to their advantage rather than to their disadvantage. The trial court neither admonished Mr. Hale in the course of the argument nor adverted to any misconduct on his part in the charge to the jury. The whole matter was allowed to rest by the court and counsel for plaintiffs until an adverse verdict was returned. The court said in its opinion that it would have done no good to admonish the plaintiff or instruct the jury. How is that fact to be determined? Ordinarily, an attorney guilty of misconduct upon the trial is reprimanded forthwith and the jury is instructed not to be influenced thereby.

While it might have been more in accordance with the usual practice for Mr. Hale to decline to defend Phipps, under the circumstances he was put in rather a difficult position by Phipps' own conduct. At some possible risk to himself he continued the defense of both Phipps and the insurance company and brought the matter to a successful issue.

The trial court was of the view that the argument made by Mr. Hale amounted indirectly to a disclosure of communications privileged as between attorney and client. The court in its opinion referred to *Gutzman v. Clancy* (1902), 114 Wis. 589, 596, 90 N. W. 1081. In that case counsel for the plaintiff said of the defendant:

" 'I know Clancy. If there is $500 on the table, and Clancy's honor on that table, and Clancy was going to lose both, you can bet on one thing,—that Clancy would grab the $500, and let the honor go.' "

After being admonished by the court, plaintiff's counsel continued:

"Well, I am sorry if my remarks disturb counsel. I could make them stronger."

In this case Mr. Hale attempted to make no statements of his own knowledge, nor is his argument fairly open to the inference that he was basing the statement of disbelief in Mr. Phipps' testimony on anything except what appeared of record. If the argument made by Mr. Hale had been made by an attorney employed solely for the insurance company it could not be considered prejudicial. Of course, any attack upon the credibility of Phipps was in a sense prejudicial to the plaintiffs' case. It is quite apparent from the record that Phipps made a conscious effort to corroborate the testimony of the plaintiff Nilssen with respect to Burke's failure to take down the statement correctly. Although his statements were cautious, they may have been all the more efficacious for that reason. Under the peculiar circumstances of this case, Mr. Hale's conduct must be judged as that of any other attorney for the insurance company in determining whether it was prejudicial to the plaintiffs. So considered, it is well within the rule. *Lee v. Hammond* (1902), 114 Wis. 550, 90 N. W. 1073.

The situation disclosed in this case suggests the query whether in host-guest cases the insured and the insurer can properly be represented by the same attorney. Despite the fact that their legal interests are identical, there is no denying the fact that a host-defendant well covered by indemnity insurance oftentimes proves a difficult client. This situation in many states has resulted in the enactment of laws which prevent recovery by a guest or limit it to cases of gross negligence. We are not prepared to say that defendants who have contracted to aid in the defense of actions brought against them are so derelict in their duties that they must procure counsel who will in effect aid the plaintiff to recover. The subject is one which might very properly be considered by the legislature.

It is considered that the trial court was in error in holding as a matter of law that Mr. Hale was guilty of misconduct

upon the trial which was prejudicial to the rights of the plaintiffs.

*By the Court.*—In each case the order appealed from is reversed, and the causes remanded with directions to enter judgment upon the verdict dismissing the complaint in each case.

A motion for a rehearing was denied, with $25 costs in one case, on May 17, 1938.